First case this morning is No. 06-1387 BASF Corporation v. United States. Mr. Van Arnum. Good morning, Your Honors. I'm Frederick Van Arnum, and I represent the appellant BASF Corporation. And since 1891, when the United States Supreme Court issued its decision in Worthington v. Robbins, it's been black-letter law that imported merchandise is to be classified in its condition as imported and not in a condition brought on by post-importation processing. And in the 100-plus years since the Worthington decision, this rule of law has been uniformly followed. It's been followed by the U.S. Supreme Court. It's been followed by the Court of Customs and Patent Appeals. It's been followed by the Federal Circuit. Now, the key issue in the case before you today turns on application of this rule of law. The Court of International Trade classified the imported merchandise in the provision under Heading 3811 as an other prepared additive for mineral oil. Now, Heading 3811 is a use provision, which means at a minimum for a product to be classified under Heading 3811, it must be of the class or kind of merchandise that is used in gasoline. The record below clearly established that 0% of the imported product in its condition as imported is used in gasoline. What kind of changes were made to it in order to make it an additive? Okay, there are two things that might – there's two points I want to make on this. First, after importation, BASF Corporation takes this merchandise and they blend it with other ingredients and they create a new and different product called a deposit control additive package. Now, it's this post-importation blending operation which removes the harmful effects that the imported merchandise has on automobile engines. Don't they just put it in a solvent? Doesn't it retain its chemical nature? No, they didn't put it in a solvent, Your Honor. The solvent that's in the merchandise is a residue. In a hydrocarbon solvent? Excuse me? In a hydrocarbon solvent. The hydrocarbon solvent is residue from the manufacturing process. The solvent is added to the polyisobutylene at its initial manufacturing process to make it viscous so it can move through the reaction process. But the solvent has absolutely no effect on its use as an ingredient in the deposit control additive packages that BASF has manufactured in the United States with this product as one ingredient. There's no dispute that it eventually goes into this package. Is that right? No, that's correct. The party stipulated that BASF Corporation imports this product for use in the United States to manufacture deposit control additive packages. The party stipulated that it is this product which is certified by the United States Environmental Protection Agency for use as a gasoline detergent additive. And this is an important consideration because all gasoline sold in the United States must contain a detergent additive. Why is that important? Why is that important to the classification? Well, let me explain why it's important to the classification. A gasoline retailer can only use a product that the EPA has certified as a gasoline detergent and it's gasoline. The imported merchandise is not certified by the EPA as a detergent additive package. The government's position here is that this product is a detergent additive. It cannot be used that way. To do so would be an illegal use of the product. Gasoline retailers would be exposing themselves to extreme civil penalties if they were to use this product in its imported condition in gasoline. A second commercial aspect needs to be considered as well. It is well known within the gasoline industry that engine failure occurs when you add pure FD100 into gasoline. Tests over the years have been run on different engines, testing to see if this product can be added to gasoline. And in each test, a statistically significant portion of the test sample resulted in engine failure. But is there a chemical reaction when the final DCA is produced and manufactured? There's not a reaction, Your Honor, but it's a mixture. It's a new and different product with different ingredients. It's sold at a different commercial level. It's sold to different companies. It's sold to gasoline retailers. The imported merchandise is not sold to gasoline retailers. And gasoline retailers do not add the imported merchandise into gasoline. So those are the reasons why VSF Corporation uses this product post-importation to create a new and different product which then in turn is sold for use in gasoline applications. Now, I'm not asking this panel— How different? What is the difference between what is imported and what is sold? Oh, it's an entirely different product. It has different ingredients. Tell us the difference. Well, the product itself has been blended with synthetic carrier fluids. And it's these carrier fluids in the precise ratios that remove the harmful effects that Puret has on automobile engines. The product also has other ingredients such as demulsifiers and markers and anti-knock ingredients and other things like that which allow the product to be certified by the EPA for use as a detergent additive. Is there a chemical change? That doesn't mean that what is imported is not a prepared additive for mineral oils, does it? I would say it does because it cannot and is in fact not used in mineral oils of any type. Again, the mineral oil that we talk about here is gasoline because, again, it's the imported product which is used to make a new product and it's that new product which is put into gasoline. And frankly, it seems to me that the judge recognizes because he never says that the imported merchandise is used in gasoline. He says it's dedicated for use in gasoline. But again, the Worthington decision and the progeny thereof have addressed that. And they specifically say you don't look at post-importation processing when it comes to classifying the merchandise. The Supreme Court in the Citrion case, when faced with those pearls which had been pre-drilled, clearly those pearls were dedicated to be used after importation in making jewelry. The court said no. In their imported condition, it's not unfinished jewelry. They're pearls and classified as such. The Court of Customs and Patent Appeals addressed a very similar issue where the product for the court was flax straw. And it was clear – the opinion says this – that this flax straw wasn't going to be used entirely to make flax fibers for use in papermaking. And the importer claimed that it should classify this merchandise as flax fiber for papermaking. The court said no. In its condition, it's imported. It's not that. Even in that situation, the product is clearly dedicated to be used to manufacture flax fiber. That's this case in a nutshell. My client imports a product. The post-importation processing renders the commercially viable product. The product is certified for use as a gas additive. And there will be no more harmful effects on automobile engines if you put it into your automobile. And it's this product which is sold to gasoline retailers. I'm not asking the court here to revisit the record because the court below made findings to support exactly what I said. The court below specifically said that Purit FD 100 is not sold or used as a purit additive for gasoline. The party stipulated as to how it is used. The ASF uses it to make a deposit control additive package. The court below found that it's the deposit control additive package which is certified by the EPA for use in gasoline. So I believe that the decision of the court below is in conflict with the facts that it found. And for that reason, I would ask that you would reverse and enter a judgment in favor of the ASF Corporation classifying this merchandise under heading 3902. Now, in my remaining time, I'd just like to address another argument that the government raises, claiming that they should classify this product in 3811 as an unfinished, incomplete, prepared additive for gasoline. And that argument flows from applications of General Rules of Interpretation 2 and 3. However, General Rule of Interpretation 1 specifically says that you classify merchandise according to the language of the headings and if relevant to the language of chapter notes and section notes. And only if you can't make a decision based on General Rule of Interpretation 1 do you then go to General Rule of Interpretation 2, 3, etc. The Federal Circuit has on a number of occasions specifically said the GRIs are to be read sequentially. The most telling decision was the Pillow Text decision that we cite in our brief. The court below, in analyzing BASF's position that the product is classifiable under heading 3902 as polyisobutylene, made findings and concluded that based on the language of the heading of 3902 and the relevant chapter and section notes, chapter 3902 pursuant to General Rule of Interpretation 1 specifically provides for this merchandise. It was only when the court went and did a relative specificity analysis did it decide to classify under 3811. We submit that 3811 fails because of the reasons I've explained earlier, that the classifying merchandise in this condition is imported argument. And since the court already found that 3902 covers the merchandise pursuant to GRI 1, applying the Pillow Text decision, you can't get to GRIs 2, 3, etc., so the government's argument that this is an unfinished, incomplete, prepared additive for gasoline must fail. Where about the explanatory note to Chapter 39 that was used by the lower court? The explanatory note to Chapter 39? I think the explanatory note to Chapter 39 support classification in Chapter 39. Chapter 39 explanatory note specifically says that polyisobutylene that has been slightly polymerized and which satisfies the application of Chapter Note 3A remains in heading 39. The record at pages 30 and 31 of the Joint Appendix clearly establishes that the parties agreed that the imported product was slightly polymerized polyisobutylene, and at page 30 of the Joint Appendix, the court finds that Note 3A is satisfied. So I would argue that that explanatory note supports Powell's position that the proper tariff classification here is 3902. But is that binding? No, explanatory notes are not binding. They are simply informative of what the drafters of the Harmonized System at the international level had in mind when they drafted a particular provision. But they're not binding on this court. What I wanted to ask you is whether if you know whether polyisobutylene of this degree of polymerization has other significant uses. The imported product does not have significant uses. It does have some other uses, a very nominal amount, but there was testimony given at trial that about 1% of the merchandise is sold for use in what we'll call non-fuel applications, using it as a component in some non-derived consumer products, using it as a product in reducing oil line drag. So there is some application, of course. If they could develop that as an avenue of business, they would continue to sell through that. This is a very interesting polymer, and it has some very good uses. Right now, its primary use is as an ingredient in a deposit control ladder package. Honestly, I'm into my rebuttal, which I'd like to stay unless you have additional questions. Indeed. Let's hear from the other side. Mr. Stratford. Dr. Kluze-Kort, my name is Bruce Stratford, representing the government in this case. First, I'd like to address for a very short time the GRI 2A argument. There's nothing in heading 3811 in the chapter notes or in the section notes or in the heading language itself that would say you couldn't go on to the succeeding GRIs. It's interesting, I think, in the explanatory notes for GRI 2A, it indicates that in regard to the scope of the headings of sections 1 through 4 of the tariff schedule, that this part of the rules, the GRI 2A, doesn't normally apply. But heading 3811 is in section 6 and not in section 1 through 4. Just to give you a feel for what's in section 1 through 4 of the tariff schedule, you have live animals, vegetable products, things of that nature. So obviously something that's unfinished or disassembled or unassembled wouldn't apply in section 1 through 4. But like I said, 3811 is in section 6. They also, in the explanatory notes for GRI 2A, explain that several cases covered by this rule are set forth in the general explanatory notes for various sections or chapters. For instance, section Roman 16 covers machinery. So the raw product might be, say, iron, and the finished product might be a water pump. And what they're saying there is if you have a disassembled water pump, that would be covered by GRI 2A, and you would expand the scope of the water pump provision to allow you to then say that's covered by the water pump. Mr. Stratford, we're not talking about water pumps here. How do you respond to Mr. Van Arnam's assertion that the product as imported is not a prepared additive for gasoline? I mean, that's the issue. I think that gets into the conditions as imported, Your Honor. Yes, please do. And could I just make one more point on GRI 2A, and then I'll address that question directly. The other point is that if you have an unassembled wearing apparel, for instance, a shirt or such, the explanatory notes for Chapter 61 explain that unassembled wearing apparel is classified in Chapter 61 as an item of wearing apparel. And so what you'd have, you'd have promethasia. This unassembled wearing apparel is classifiable as a cotton cloth. But the assembly is more like the chemical reaction, which here doesn't occur. Right, right. GRI 2A. So why are you saying that that applies? GRI 2A covers both unfinished items and also unassembled items. It would be helpful if you stayed with chemical compositions. I'm sorry, Your Honor, I didn't understand that. I'm trying to understand the analogies that you're drawing for us. I would trust that there are closer analogies in chemical compositions than to making a shirt. Well, what I'm saying is even though an unassembled cotton shirt can be promethasia classifiable as a cotton cloth, the GRIs say that you expand the scope of an unassembled cotton shirt, and therefore it's classifiable, promethasia, as an assembled cotton shirt. So then you compare the general specificity between the cotton cloth and the assembled wearing apparel, and clearly it would be classifiable as a wearing apparel. So here in the complexities of the import business, are there any analogies to the importation of components of chemical compositions? Not that I have research, Your Honor, but as we spelled out in our section dealing with the GRI 2A analysis, the essential character of the FD-97, which is the detergent package, is provided for by the FD-100, the import product. Now, if I could go through, does that explain that, Your Honor? It explains the absence of significant precedent for this classification. Okay. Well, we do have a number of cases dealing with whether if something is mixed with something else, does that somehow change the condition of the article as import? Well, I cited in the red brief three cases, the P.J. Hanna-Rand case, that's a CCPA case, the MIDAC copy star case, a CEFC case, and the H. Reisman case. All three of those cases say that if you take an imported product and mix it with something else, and then that product is classifiable, it hasn't changed the condition of the product as imported. For instance, in MIDAC copy star, we were dealing with a toner and another item, and both of those were chemicals for photographic use as imported, but they could not be used for that until they were mixed together. But that didn't change the fact that they were still for photographic use. And in those examples, was there an Aonamine classification for the component separately? Yes, yes. The chemical was for photographic use, a toner, but it couldn't be used then for photographic use until it was mixed with the other item. And there, it was mixed with the other item in order to effectuate that use for photographic purposes as a copy. But can the FD100 be used by itself as a straight detergent in engines? Could it be used? Whether it's efficient or not is another question, isn't it? It was testimony that it could be introduced into the gasoline separately, and the reason why they mixed these things together before it's introduced into the gasoline was for economic reasons. But there was testimony by BDF witnesses that you couldn't introduce these things in individually, you'd just have to, all of the ingredients would have to go in. And for instance, one of the ingredients of the package is a corrosion inhibitor. That is Aonamine provided in heading 3811. So even though the corrosion inhibitor is put into this package, it's included as an additive in 3811. One exposition is that the important product, the FD97, is another pure additive along the line of the Aonamine-provided items. Is there a testimony in the record that shows specifically that the FD100 could be used as a detergent, as an additive, just by itself? I don't think it would be added of the used separately. Just as imported. Just by itself, the FD100 would not be put into gasoline by itself. Why not? The trial testimony didn't get into that precisely, but what I can say is there was testimony that the FD100 is registered with the EPA as a gasoline additive. As imported? As imported, yes. And what that means is it can be added to gasoline. Without any other changes? Well, there's no changes when it's added to the package, either. It's just mixed together, no chemical reactions. It's like adding, say, sugar to coffee. You can evaporate that, and there's the sugar. There was testimony that all of the additives that are added to gasoline in these packages could be taken out. Now, Mr. Van Arn told us that if you just add it, it stops the engine. You heard him say that. Yes. I gather that he was telling us about evidence testimony that was presented. It is not just added by itself, and the government agrees with that. It's not just added by itself. It needs to be because it's not certified as a gasoline detergent additive. It stops the engine because it's not certified? It's not certified, but it is registered with the EPA as a gasoline additive. And it is, in fact, whether it would go in by itself or would go in as part of a package, it's still being added to gasoline. What makes it prepared? Prepared is put together for a specific purpose. And how is this put together for that purpose? Well, because they have to tailor the polyoxobutylene amine with a very narrow bell curve, so to speak, and so you get the right proportion of the chemical elements of the PEMA. But BASF has acknowledged and agrees that this is a preparation and that this is an additive. Well, it's pretty clear that it's an additive, but the trial court was pretty sketchy about why it's prepared. Dr. Fair and the BASF expert testified that it was a fair additive. And what was his testimony as to how it was prepared? It's the manufacturing process. To take the basic raw material and to make it into the polyisobutylene with the hydrocarbon solvent. That's what makes it prepared. In other words, it's combining it with a solvent. Well, that's one aspect of manufacturing, but what they are doing with this preparation and manufacturing is to make it so it has a detergent quality for gasoline. And you have to narrow the bell curve so it fits just right. There was a whole host of testimony. What's this bell curve? Is it a measure of purity? Polyisobutylene? I don't think it's that simple. I can't think of the right technical word for it, but you have to have a narrow scope and you have to have a tail on the... Are you saying that polyisobutylene is not a natural material? It had to be synthesized and that is why it's prepared? Well, certainly there's a lot of processing. It's just not something, say, you mine or it's not a chemical element by itself. It is a polymer, but it's a specific type of polymer. And it's been tailored to be able to provide the detergents you need in gasoline. And I think of a question and a lot of testimony that this is the element, the FD100, that provides the essential quality, essential character of the overall package. And this is a detergent additive package. And the reason why it's able to be called such is because the detergency provided by this polyisobutylene amine and has a special tail on it that's covered by several patents and indicate that this is the type that provides detergency for the gasoline. That gets into the... Or is it the gasoline additive with some other detergents added later? You still haven't answered the question as to whether or not the F100, the FD100, can be used as a gasoline additive by itself. Well, there was testimony that it can be used by itself. On this VW test, it's not compatible with this particular type of engine. And it was optimized... Not compatible with any engine or just that particular engine? Well, with that particular engine, there was testimony. There wasn't testimony about other engines, this particular engine here. And therefore, BASF, in their wisdom, decided to formulate this particular package. And that's the package they certified with the EPA as a detergent additive package. But the... Was the FD100 also certified by the FDA? Excuse me, Your Honor? You said that the FD100 was also certified separately by the FDA? That's registered with the FDA as a gasoline additive. By itself? Without any additions to it? Well, yeah. Depending perhaps, Your Honor, on the meaning of the register and the meaning of certified. But it is registered by itself as a gasoline additive. Any more questions for Mr. Stratford? Any more questions? Thank you, Mr. Stratford. Your Honor, there was testimony we cited in our brief, where the experts from both sides of the table agreed that it was well known in the industry that the added purite into gasoline could cause engine failure. Texaco ran fleet tests using Toyota Camrys. BMW ran fleet tests using BMWs. And in each case, a statistically significant portion of the sample failed. And these giant gasoline retailers can't take the chance of ending up on the national news trying to explain why all of a sudden cars all across the United States are failing after having just filled up at their service station. But that goes to the efficacy, not to whether or not the FD100 can be used as a gasoline additive, as imported. Your Honor, let's look at this one other way. The tariff is to be construed to reflect commerce. That's the Meade case. And Congress is understood to know what's going on in commerce when they draft tariff provisions. I've given two examples why the trade does not and cannot use this product in this condition as imported in gasoline. You mean it's not a polished final product, but it still is an additive? Your Honor, it's an additive. It is prepared as an additive for use in gasoline? No, it's prepared and it's an additive, but it's added with other ingredients to make the deposit control additive package. It is not a prepared additive for gasoline. Again, it is not used in gasoline, and it's condition is imported. And that, again, is the test that's set out in the Worthington and its project. You need to look at this. It may have other materials, other additives added to it, but it is still the same material. It is polyisobutylamine in a hydrocarbon, isn't it? Your Honor, no, it's not. It's a new product. This new product has different physical characteristics. It has different things in it. It's sold to a whole different level of trade. It's at a different price. It's a new value-added product. I respectfully disagree with that characterization of the product. Yes, the molecules that are in Purit FD100 end up in gasoline, but they don't end up in gasoline directly because it can't work if you do that. You couldn't add it because it's not certified by the EPA for use as a gasoline detergent. And the government's contention is that this is a gasoline detergent or it's an unfinished, incomplete gasoline detergent. In either event, it is not used in its condition as import as a gasoline detergent for the reasons I explained earlier. Now, as for their argument about— What is your registration with the— Well, let me explain the difference between registration and certification. As I said, all gasoline sold in the United States has to contain a certified gasoline detergent additive. And the EPA requires that you bring your product and certify it by showing that you passed all kinds of different engine tests. However, the EPA is also concerned about air quality and emissions. So anything that could end up in gasoline directly or indirectly has to be registered. You have to go to the EPA and say, here's the chemical structure. So when BASF goes to certify their prepared additive for gasoline, they need to show what are the ingredients and the chemical compositions of those ingredients because eventually those molecules end up in gas. But it's the same is true for chemicals that are used at the refinery, chemicals that are added into the pipe to keep the viscosity of the fluid moving back and forth. All that sort of stuff has to be registered because it ends up in gasoline. And none of that stuff is being added at all for any functionality in the end product. So that's the difference between registration and certification. Certification is the key issue here because gasoline retailers will not put uncertified product in their gasoline to impart detergency. Pure FD-100 is not certified for such use. One last thing about the Mina Coffee Star case. I disagree with counsel's characterization. That case was very simple. The court looked at the two ingredients, the toner and the developer. And it said, we're going to look at each of these products as discrete entities. And the issue was whether or not they were unmixed. Both products were mixtures. Therefore, the court said, these are mixtures. They are not unmixed. It was the plaintiff in that case that said, no, no, no. They're only mixed together after importation. So ergo, in their condition as imported, they're unmixed. The Federal Circuit explicitly rejected that approach and said, no, that's not the case. In fact, in their condition as imported, the two discrete compounds are mixtures. Your Honor, that's what I'd like to address today unless you have any other questions. Let's see. Any more questions? Any more questions? Thank you. Thank you, Mr. Van Arnam and Mr. Stratford. The case is taken under submission.